Filed 2/27/15  P. v. Dalton CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>JENNIFER DALTON,<br><br>      Defendant and Appellant. | C069572<br><br>(Super. Ct. No. 09F05290) |

Defendant Jennifer Dalton shot and killed her husband Craig as they argued in the garage of her house.  Convicted of second degree murder, she appeals.  She contends that:  (1) the trial court admitted improper character evidence, (2) the court improperly admitted evidence of her other domestic violence, (3) the court admitted improper lay opinion concerning whether defendant was going to kill her husband, (4) the court improperly failed to strike victim impact evidence, (5) the court improperly refused to instruct the jury to presume defendant acted in self-defense against an intruder, (6) the

1

prosecutor engaged in prejudicial misconduct, and (7) the errors were cumulatively prejudicial. Finding no prejudicial error, we affirm.

## FACTS[1]

Defendant married Craig Dalton in November 2006, and from the beginning there was conflict in the marriage. Before and soon after the marriage, defendant learned things about Craig that upset her. Before they were married, she learned that Craig had been married twice before, not once as he had led her to believe. She also learned before they got married that, contrary to what Craig had led her to believe, he was a smoker and did not own his home. After the marriage, defendant and Craig initially lived separately.

On at least two occasions after the marriage, defendant went to Craig's residence, yelled at him about his premarriage lies, and slapped him. Craig did not retaliate but only defended himself. Twice, defendant pointed a gun at Craig at her residence, and once she tried to run him off the road with her car while he was riding a bicycle.

On January 21, 2008, a 911 call was made from defendant's home. A 911 operator called back and spoke to defendant. During the call, defendant and Craig could be heard arguing and accusing each other of violence. Craig said that defendant had held a gun to his head. Defendant said that Craig did not live there and had his own residence, while Craig said he lived there. Defendant said that her gun was under her bed. She also complained about Craig's lies and added, "I gave up my world for him. I kept this house now the market's gone down. I lost all my equity. [¶] . . . [¶] I was going to move away. I stayed here for a man."

---

[1] In her opening brief, defendant's statement of facts relied most prominently on her own exculpatory testimony. We, on the other hand, present this summary of significant facts in the light most favorable to the jury's verdict. Additional details are provided in the discussion as they are pertinent.

Two Elk Grove police officers responded to defendant's home. They did not see any evidence that Craig had assaulted defendant or that defendant had assaulted Craig. One of the officers went to the bedroom and found a gun under the bed, but there was dust on the gun. It did not look like it had been moved recently. The officer did not touch the gun but left it under the bed.

Craig and his two daughters did not move in with defendant until April 2008, about 17 months after the marriage. After Craig moved in, defendant's frustration with Craig's lies escalated. Defendant also became frustrated with the behavior of Craig's daughters and Craig's lax parenting. Craig and defendant lived together for about five months before Craig moved out in September 2008.

In April 2009, Craig and defendant went to a marriage therapist together to try to save their marriage. Defendant did most of the talking. She told the therapist that Craig had lied to her about several things, including whether he would be able to help her pay for her home. She also criticized Craig's daughters, saying they were messy, lazy, and undisciplined and that she hated them. Defendant did not like the amount of influence Craig's ex-wife had on him. She was concerned about a pay cut she had received and was on the verge of losing her house. She also talked about other financial pressures. As she talked about these issues, she appeared angry. Craig participated in the discussion, but he was not as angry and animated as defendant.

Two months later, in June 2009, Craig and defendant again met with the marriage therapist. Craig had filed for divorce, but they were still working on saving the marriage. Craig's lies and the financial pressures continued to be problems for defendant. Craig complained about defendant's treatment of his daughters and defendant's dislike of his ex-wife and about how she frequently "f[lew] off the handle." Defendant's emotional state was even more heightened than it had been in the prior session; she had difficulty regulating her emotions and tolerating stress. She was livid about Craig not helping pay

3

for the house. Defendant never indicated that Craig had abused her physically or sexually.

The therapist diagnosed defendant as having an adjustment disorder with a depressed mood. And the therapist characterized Craig as somewhat passive because he did not have a lot of answers and did not fight back.

After Craig moved out of the house, defendant told a friend repeatedly that she felt that Craig had ruined her life and she "just want[ed] to kill him for it." She had ill will in her tone of voice. She also sent an e-mail to Craig telling him that he had ruined her life and she wanted to kill him for it. Defendant also expressed frustration and a desire to kill Craig's daughters. She was livid and irate. She considered throwing spark plugs at Craig's windows to scare him.

In June 2009, about one month before defendant killed Craig, she interrupted a meeting at work using profane language and saying she wanted to kill Craig. She made chopping motions with a simulated machete and then pretended to pull out a gun and shoot it.

Defendant expected Craig to help her financially, and, when he did not, she would get more aggressive in her tone and demeanor in talking to others about Craig, saying she wanted to kill him. These outbursts increased in frequency after Craig filed for divorce and one of defendant's dogs died.

Defendant told a friend several times that she wanted to kill Craig and his children and then "commit suicide by cop." She made another friend promise that, if she died, the friend would take care of her dogs.

On July 7, 2009, defendant quit her job and bought ammunition for her gun. Defendant's friend heard that defendant had bought ammunition, so the friend called defendant to ask whether it was true. Defendant told her, "[A]ll I can tell you is I'm going to call you up and tell you to duck."

On July 13, 2009, Craig went to defendant's residence in the afternoon. Craig and defendant were seen arguing in the garage, yelling at each other with the garage door open. The arguing went on for about 30 minutes until defendant shot Craig three times. After defendant fired the shots, she closed the garage door.

Defendant called 911, upset and screaming, and told the dispatcher that she had shot her husband. She said he had come to her house, threatened her, and told her about his other women. He had ruined her life. She told the dispatcher she did not want to give him CPR because she was the one who shot him.

Craig died from three gunshot wounds to the torso.

Additional facts are related in the discussion as they become relevant to the issues argued.

PROCEDURE

After a jury acquitted defendant of first degree murder (which had been accompanied by a special circumstances allegation of lying in wait) but was unable to reach a verdict on second degree murder, a second jury convicted defendant of second degree murder (Pen. Code, § 187, subd. (a)) and found true the allegation that she personally and intentionally discharged a firearm, causing death (Pen. Code, § 12022.53, subd. (d)). The trial court sentenced defendant to an indeterminate term of 15 years to life for second degree murder, with a consecutive term of 25 years to life for discharging a firearm and causing death, for a total of 40 years to life in state prison.

DISCUSSION

I

*Admission of Irrelevant Character Evidence*

Defendant contends that the trial court, over her objection, admitted bad character evidence that was not relevant and prejudicial to her. We conclude that defendant's contentions as to the various pieces of evidence are without merit because, variously, (1) she forfeited consideration of the issue by not objecting to admission of the evidence

5

at trial, (2) she does not adequately identify the evidence in her opening brief, (3) the evidence was admissible, and (4) the prejudicial effect of the evidence did not substantially outweigh the probative value.

    A.    *Law Applicable to Defendant's Contentions*

        1.    Forfeiture

The Attorney General contends that many of defendant's assertions of error in admitting evidence, with respect to both this contention concerning character evidence and other contentions of evidentiary error, were forfeited because no timely and specific objection was made to the admission of the evidence in the trial court or no ruling was made by the court.

"Under Evidence Code section 353, subdivision (a), a reviewing court cannot grant relief on a claim that evidence was erroneously admitted unless a timely objection was made 'and so stated as to make clear the specific ground of the objection or motion.' ' "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." ' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214.)

Failure to obtain an express ruling on the evidentiary objection also forfeits the admissibility issue on appeal because we review a trial court's rulings on the admissibility of evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1249.)

"A properly directed motion in limine may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.] However, the proponent must secure an express ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171, italics omitted.)

In her opening brief, defendant claims generally that she preserved objections to the evidence she now contends was inadmissible. She cites to the first page of each of

two motions in limine that she filed in the trial court.  It appears that the trial court deferred ruling on the in limine motions pending proof at trial.

As noted, we must look at each instance of evidence that defendant claims was inadmissible and determine whether the trial court expressly ruled on the admissibility of the specific evidence.  In other words, for purposes of preserving evidentiary issues for appeal, it is not sufficient to cite to an in limine motion and contend generally that general categories of evidence were objected to.

Defendant also cites generally to her motion for new trial, in which she made several contentions of error in admitting evidence.  Such contentions in a motion for new trial, however, are not timely and do not preserve for appeal any contentions of improper admission of evidence.  (Evid. Code, § 353, subd. (a).)

In her reply brief, defendant claims generally that, to the extent consideration of issues on appeal was forfeited by failure to object in the trial court, trial counsel may have violated defendant's right to effective assistance of counsel.  Such a claim raised for the first time in a reply brief does not merit consideration.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 353.)

2.      Adequacy of Briefing

The opening brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears. . . ." (Cal. Rules of Court, rule 8.204(a)(1)(C).)  The appellant, who bears the burden of showing that an objection was erroneously overruled, "must cite to the record showing exactly where the objection was made.  [Citations.]  When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.]  We can simply deem the contention to lack foundation and, thus, to be forfeited.  [Citations.]"  (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.)

7

The appellate court has no obligation to search the record to find evidence that supports an appellant's contentions. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) Therefore, an appellant's failure to adequately cite to the record forfeits consideration of the issue raised.

Much of the evidence to which defendant objects on appeal is recounted in the statement of facts, with citations to the record. However, defendant does not cite to the record in the argument section of the brief, leaving the reader to hunt for the citations to the record in the statement of facts and for objections to admission of the evidence. This practice makes it difficult to find the citations in the record. To the extent we have been able to locate the challenged evidence in the record, as well as the objections and rulings of the court, we disregard this failure to comply with the briefing requirements. (Cal. Rules of Court, rule 8.204(e)(2)(C).) However, to the extent we have not located the challenged evidence and objections to it, the claim is forfeited.

### 3. Admissibility

#### a. Evidence Code section 350 – Relevance

Only relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

#### b. Evidence Code section 1101 – Character Evidence

While evidence of a person's character or trait of character is generally inadmissible to prove that person's conduct (Evid. Code, § 1101, subd. (a)), it may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

8

c. Evidence Code section 1103 – Rebuttal that Victim was Aggressor

Also, "[i]n a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant . . . ." (Evid. Code, § 1103, subd. (b).)

d. Evidence Code section 352 – Prejudice Substantially Outweighs Probative Value

Finally, even if evidence is relevant, "[i]t is within a trial court's discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.)" (*People v. Mendoza* (2007) 42 Cal.4th 686, 699.) "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) "The court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value. [Citation.]" (*People v. Brown* (1993) 17 Cal.App.4th 1389, 1396.) "We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

Failure to base a timely and specific objection to evidence on Evidence Code section 352 forfeits consideration on appeal of that ground for exclusion. (*People v. Williams* (1997) 16 Cal.4th 153, 206.)

B.	*Contentions Concerning Specific Evidence*

Defendant discusses seven general categories of prior bad acts concerning which evidence was presented.

1.	Acts Directed at Paul Burns

Defendant and Paul Burns were engaged and bought a house in Elk Grove together in 2003. The relationship was turbulent, and defendant blamed Burns for their troubles. Toward the end of the relationship, defendant pushed Burns, knocking him to the ground. Another time, she slammed a door into him. In 2005, the relationship ended. Later, defendant threatened to damage Burns's Lexus and told him he was ruining her life. The housing market was at a peak, and they could have sold the house for a profit, but defendant decided instead to buy out Burns's interest in the house. She threatened to burn the house down if Burns did not agree to a lower price for the buyout than he had anticipated. She told Burns that he "better watch [his] back." Burns was afraid to ride his motorcycle for fear she had tampered with it. Burns relented on the house and accepted the lower price.

The prosecution played audio recordings of phone messages defendant left for Burns. The messages were vulgar, and defendant blamed Burns for her troubles. She hoped he would die.

Before trial, defendant objected to the evidence of her conduct relating to Burns. The trial court determined, however, that her conduct relating to Burns was relevant to her claim that she killed Craig in self-defense, both actual and imperfect. It went to her motive and intent.

The only objection to specific evidence during trial, accompanied by a ruling by the trial court, was to Burns's testimony that he worried that defendant had tampered with his motorcycle. Defendant objected that the question about the motorcycle called for speculation. But the court overruled the objection, stating that the testimony went to the witness's state of mind.

On appeal, defendant contends that Burns's testimony constituted irrelevant and prejudicial bad character evidence under Evidence Code section 1101. We disagree. As the trial court found, defendant's conduct relating to Burns was relevant to her motive and intent when she killed Craig. It established that, when under financial pressures, she would threaten and retaliate against her partner, and therefore was relevant to whether Craig was the aggressor. It was therefore admissible under Evidence Code section 1101, as well as Evidence Code section 1109, as discussed later.

### 2. Threats to Other People

Defendant threatened strangers when they angered her. She lost her temper with someone who took her parking spot and another person who blew leaves toward her side of the street. She threatened a person over the phone concerning a loan modification and the veterinarian who she did not think did enough to save her dog. The testimony concerning these threats was not specific as to what she would do except as to the veterinarian. She said she wanted to ram her car into the veterinarian's building.

Defendant did not object to and obtain a ruling on admission of this evidence concerning threats to people other than her partners. Accordingly, the issue was not preserved for appeal.

### 3. Prior Suicide Attempt

Paul Burns testified that, in 2003, when he and defendant had temporarily broken up, defendant tried to commit suicide. She left angry messages for Burns on his phone, blaming him for financial and other problems and telling him that she was going to kill herself. She also called her mother and sister and told them she was going to hurt herself. Burns hurried home and found that police and others were already at the residence. Defendant was in the hospital for several days. The cited portion of the record does not reveal what defendant did to herself.

Before trial, defendant objected to admission of evidence of her suicide attempt, arguing that it was highly inflammatory. During trial, defendant objected that the

11

evidence of her suicide attempt was more prejudicial than probative and that it violated her right to have her medical records remain private. The trial court overruled the objection. Relating specifically to the admissibility of her suicide attempt, the court said: "[T]he Court will note as to the issue of the suicide, it's not [] the fact that she tried to commit suicide that is so relevant here. What's relevant is that when she tried to commit suicide she called Paul Burns, according to Paul Burns, left a message indicating that Paul Burns was responsible for all her problems, and that he had brought her down, and that she wanted him to pay. That's what's relevant. That's a very hostile, as one could argue, as people are arguing could be hostile, manipulative act, and could be characterized as abuse."

On appeal, defendant argues that the evidence of her suicide attempt should have been excluded because it was improper character evidence under Evidence Code section 1101. However, she did not base an objection to that evidence in the trial court on Evidence Code section 1101. Instead, she argued that the evidence was more prejudicial than probative (Evid. Code, § 352) and violated her privacy rights. Therefore, she forfeited consideration on appeal of her current Evidence Code section 1101 objections.

Even if the objection can be construed as relying on Evidence Code section 1101, the evidence was properly admitted. It showed one of her several hostile and manipulative acts against her partners, blaming them for her problems, and thus supported the prosecution's theory of motive that defendant killed Craig because of her hostility toward him based on their financial problems.

    4.  Defendant as the Primary Aggressor

Risha Hartman, one of defendant's friends, testified for the prosecution. On cross-examination and in response to defense counsel's questions, she testified that defendant was verbally and physically abusive toward Craig, giving specific examples. Hartman responded affirmatively to a question about whether Craig was less aggressive than defendant in the relationship.

12

On appeal, defendant argues that the evidence that she was the primary aggressor in the relationship should have been excluded. She does not acknowledge that the evidence was elicited on cross-examination by her own attorney. And she gives us no reason to consider, on appeal, the admissibility of testimony her own attorney elicited. Therefore, she forfeited consideration of the issue on appeal.

5.     Defendant's Mental Health

Defendant contends that the trial court improperly admitted evidence that she may have suffered from obsessive-compulsive behavior, a bipolar disorder, depression, an adjustment disorder, and a borderline personality disorder as character evidence under Evidence Code section 1101. At trial, defendant objected to evidence about her mental health based on privacy protections, but she did not object to the mental health evidence as improper character evidence under Evidence Code section 1101. Accordingly, she forfeited consideration of that issue on appeal.

6.     Failure to Seek Mental Health Treatment

There was also evidence that defendant was advised to undergo treatment for mental health problems but did not. However, defendant did not make a timely and specific objection to admission of that evidence, so her assertion on appeal that it was improperly admitted was forfeited. Near the end of trial, long after the evidence was admitted, defendant objected that the evidence of her failure to undergo treatment for mental health problems was improper "character assassination." The untimely objection did not preserve the issue for appeal.

7.     Erratic Behavior

Defendant contends that evidence of her erratic behavior was improperly admitted as character evidence. She does not claim that she objected to the evidence on this basis, but in her reply brief she says: "Given all of the trial court's other rulings on character evidence, any further objections would have been futile." Defendant does not specify which rulings of the trial court rendered futile an objection to evidence of her erratic

13

behavior as inadmissible character evidence.  Therefore, consideration of the issue is forfeited.

*Admission of Prior Domestic Violence Evidence*

At trial, the prosecution introduced evidence of defendant's domestic violence against Craig and others under Evidence Code section 1109.  On appeal, defendant contends that the trial court erred by admitting some of this evidence because (1) the acts did not constitute domestic violence or (2) the evidence was more prejudicial than probative.  The contention is without merit.

A.    *Evidence Code section 1109*

Evidence Code section 1109 provides that when a defendant is accused of an offense involving domestic violence, evidence that the defendant committed other uncharged domestic violence is admissible unless precluded under Evidence Code section 352.  (Evid. Code, § 1109, subd. (a)(1).)  Evidence of other domestic violence is admitted to show the defendant has a propensity to commit acts of domestic violence (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232) and is an exception to the general rule, stated in Evidence Code section 1101, that evidence of a defendant's bad character is inadmissible when offered to prove that person's conduct on a specified occasion.

Using evidence of prior domestic violence to show a propensity to commit the charged domestic violence offense does not violate due process rights because Evidence Code section 1109 affords the defendant substantial protections.  (See, e.g., *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1029.)  In particular, the statute allows the trial court to exclude evidence of prior domestic violence if the prejudicial effect of the evidence substantially outweighs its probative value under Evidence Code section 352.  (Evid. Code, § 1109, subd. (a); *People v. Johnson, supra*, 77 Cal.App.4th at p. 420.)  The weighing process under Evidence Code section 352 requires consideration of the unique facts and issues of each

case, rather than the mechanical application of automatic rules.  (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)  But consistent with the legislative intent behind Evidence Code section 1109, " ' "[t]he principal factor affecting the probative value of an uncharged act [of domestic violence] is its similarity to the charged offense." ' [Citation.]" (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)  Other factors relevant to the trial court's consideration include whether the evidence of the uncharged act of domestic violence comes from an independent source, which reduces the danger of fabrication; the recency or remoteness of the uncharged offense; whether the evidence would unduly confuse the issues; whether presentation of the evidence would consume inordinate time at the trial; and whether the evidence of uncharged conduct is inflammatory when compared with the facts of the charged offense.  (*Id.* at pp. 533-535; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119-1120.)

A trial court need not expressly weigh prejudice against probative value or even expressly state it has done so when making an Evidence Code section 352 determination. (*People v. Williams* (1997) 16 Cal.4th 153, 213.)  If the record demonstrates the trial court understood and fulfilled its responsibilities under Evidence Code section 352, we will not disturb the trial court's exercise of discretion except upon a showing that its decision is arbitrary, capricious and patently absurd.  (*Ibid.*; *People v. Brown, supra*, 192 Cal.App.4th at p. 1233; *People v. Jennings, supra*, 81 Cal.App.4th at p. 1314.)

B.     *Contentions Concerning Specific Evidence*

The prosecution introduced evidence about defendant's former husband, John Tate, and her former fiancé, Paul Burns, and defendant's actions relating to those two men.

1.     Defendant's Acts Relating to Tate

As relevant to this contention, the prosecution elicited testimony from defendant on cross-examination that she was upset when she learned that Tate had been unfaithful

15

and she and Tate broke up. On the phone, she threatened to break Tate's chess set if he did not provide details about his communications with other women.

Defendant filed a motion in limine seeking exclusion of the evidence that she had broken Tate's chess set. However, the prosecutor said he did not intend to call Tate as a witness, and the parties dropped the matter without obtaining a ruling.

Defendant did not object to this evidence when it was elicited during trial and obtain a ruling; therefore, she has forfeited the issue of its admissibility on appeal.

Defendant accuses the prosecution of "sandbagging" because Tate did not testify at the trial but the prosecution was able to get the evidence admitted through defendant's testimony. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 642-643.) To the contrary, as discussed above, her violent tendencies with respect to former partners was relevant and therefore was a proper subject of cross-examination when she testified, even though Tate did not testify. If defendant wanted a ruling on the admissibility of the evidence, she should have objected and obtained a ruling.

### 2. Defendant's Acts Relating to Burns

As relevant to this contention, the prosecution introduced evidence that defendant and Burns had difficulties selling their house and agreeing to a financial settlement when they broke up. Defendant claims that this did not qualify as domestic violence and the prosecutor's sole purpose in introducing this evidence was to show that defendant "was a materialistic and difficult person, not that she had a propensity to kill intimate partners when they had financial difficulties." She also claims that other evidence of her conduct relating to Burns was more prejudicial than probative and should have been excluded. She does not, however, give citations to the record where this evidence was admitted, she simply refers to "evidence of [defendant's] interactions with ex-fiancé Paul Burns," a wide-ranging and unspecific category.

Defendant's contention is without merit for two reasons. First, the evidence about the financial difficulties with Burns was background for the evidence of her domestic

16

violence against Burns.  As such, it was relevant to the jury's understanding of the domestic violence evidence and its relevance to defendant's violence against Craig.  And second, defendant improperly attempts to narrow the admissibility of the evidence by limiting admissibility to evidence showing she had a "propensity to kill intimate partners when they had financial difficulties."  There is no authority for such extreme narrowing of the admissibility of prior domestic violence evidence.  As we explained, the similarities or differences between the prior domestic violence and the current domestic violence are relevant to the Evidence Code section 352 analysis, but that is only one consideration.  In fact, here, the prior domestic violence against Burns showed that defendant had a propensity to act violently against a domestic partner whom she blamed for financial difficulties.  Therefore, evidence of the financial difficulties between defendant and Burns was relevant and admissible.

Defendant claims that, in her words, "this Court must determine whether [the evidence of prior domestic violence was] more probative than prejudicial on the question of [defendant's] intent, which was the only issue being litigated at trial since she admitted shooting Craig."  This misconstrues our role in two ways.  First, it is not sufficient for exclusion under Evidence Code section 352 that the evidence is "more probative than prejudicial."  Instead, the prejudicial effect of the evidence must *substantially outweigh* the probative value.  And second, we, as the appellate court, do not weigh the probative value of the evidence against the prejudicial effect in the first instance.  Our role is to review the trial court's admission of the evidence for abuse of discretion.

Defendant claims that the probative value of her domestic violence against Tate and Burns was minimal because the only issue related to her killing of Craig (which she admitted doing) was whether she killed in self-defense or heat of passion and her violence against her former partners was not relevant to those issues.  She asserts that "[n]one of the prior alleged acts of domestic violence showed [defendant] was likely to kill an intimate partner in a rage."  To the contrary, her domestic violence against Tate

17

and Burns showed her propensity to commit acts of violence against domestic partners in specific factual settings.

## III

### *Admission of Testimony Concerning Witnesses' Apprehensions*

Defendant objects on appeal that several witnesses expressed an opinion concerning the ultimate issue of defendant's guilt by testifying that they believed in advance of the murder that defendant was going to do something harmful to Craig. On appeal, defendant contends the trial court erred by admitting this opinion evidence. The contention is without merit.

A.    *Relevant Law*

A lay witness may testify to an opinion when it is rationally based on the perception of the witness and is helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) "Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman* (2006) 38 Cal.4th 344, 397.) This is so even if the testimony touches on the ultimate issue in a case, "but only where 'helpful to a clear understanding of [the] testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.]' " (*People v. Melton* (1988) 44 Cal.3d 713, 744.) Admission of lay opinion testimony is within the trial court's discretion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127.)

We consider each instance of evidence defendant now contends was improperly admitted and find that the issue was forfeited because defendant did not object to the testimony as improper lay opinion. In her reply brief, defendant asserts she did not forfeit consideration of the issue by failing to object because any objection would have been futile, based on the trial court's rulings throughout the trial. She does not specify

18

which trial court rulings support this assertion, other than directing us to the entirety of the trial; therefore, the assertion is without merit.

      B.     *Witnesses*

      1.     Mary Ann Barr

Defendant's friend, Mary Ann Barr, testified that she struggled with testifying because she felt she may have been able to do something to prevent the killing. Defendant objected generically, and an off-the-record sidebar discussion was held. Later, Barr testified again that "[t]his is the most difficult thing I've ever done in my entire life . . . because of the regret and the guilt that I feel that maybe I could have prevented something this tragic from taking place."

Outside the presence of the jury, the court gave counsel time to put the substance of the sidebar discussion on the record. Defense counsel said that her objection was that the evidence was "clearly victim impact testimony" because Barr talked about Craig's children not having a father. There was no discussion concerning Barr's testimony being a lay opinion that defendant would kill Craig.

On appeal, defendant contends that Barr's testimony should have been excluded as improper lay opinion. Since she did not object to the evidence on that basis in the trial court, she forfeited consideration of the issue on appeal.

      2.     Matthew Thornburg

Matthew Thornburg testified that he feared that defendant would do something to Craig. He based this fear on Craig having told him, jokingly, that "he had to sleep with one eye open because he was afraid she would shoot him." Thornburg told Craig that Craig needed to find defendant's gun and get rid of it.

Defendant objected to Thornburg's testimony on this topic based on relevance, and the trial court overruled the objection.

Defendant forfeited consideration on appeal of whether Thornburg's testimony was improper lay opinion because she did not object to the evidence on that basis. In her

19

reply brief, defendant also claims that an objection would have been futile because of the ruling on her relevance objection. That is not self-evident. We see no reason why the court would have refused to rule independently on the improper lay opinion issue if it had been raised.

### 3. Nancy England

Defense counsel elicited testimony from Nancy England that she told Craig 50 to 300 times to get away from defendant. On appeal, defendant does not even acknowledge that defense counsel elicited the testimony, yet she contends the trial court erroneously admitted it. Since defense counsel elicited the testimony and there is no ruling to review, there is no reason for us to determine admissibility.

We note that the prosecutor elicited similar testimony from England that she had advised Craig many times to get out of the relationship with Craig. However, defendant does not cite that testimony in her contention on appeal that improper lay opinion was admitted.

### 4. Lisa Merkel

Defendant asserts that Lisa Merkel "testified about the fact that after the shooting, [she] felt uncomfortable and [was] upset, losing sleep over the situation." On appeal, defendant does not relate this statement to whether there was error in admitting improper lay opinion; therefore, we need not consider it further.

### 5. Police Officers

On January 21, 2008, about 18 months before the murder, Officers Derrick Metzger and Alan Mori of the Elk Grove Police Department responded to defendant's residence after a 911 call from that residence. They spoke to defendant and Craig, and they learned that Craig said defendant held a gun to his head. Knowing that Penal Code former section 12028.5 required them to take temporary custody of a firearm at a domestic violence scene, Officer Metzger had Officer Mori go find the gun that defendant told them was in her bedroom. However, there was dust on the gun that

20

Officer Mori found under the bed. Officer Mori did not touch the gun because he did not have gloves on and did not want to accidentally discharge it.

The prosecutor asked Officer Metzger why he had not seized the gun, and he responded that they could not substantiate that it had been used. He said that "it seemed . . . at the time an acceptable way of handling the investigation . . . ." Later, in an oral motion for mistrial, defense counsel claimed that the questioning of Officer Mori about accidentally discharging the gun suggested "[defendant] was going to be out there accidentally discharging, as she's public enemy number one as a result of that, when, in truth, the law permits you to have a gun loaded in your house." The court denied the mistrial motion.

On appeal, defendant claims that the prosecution's questioning of Officer Metzger about why he did not seize the gun should not have been admitted. While it is very unclear from defendant's briefing why this has anything to do with improper lay opinion that defendant was going to shoot Craig, we need not consider it because defendant did not object to Officer Metzger's testimony at the time is was elicited, and the later motion for mistrial did not constitute a timely and specific objection. In any event, defense counsel did not cite Officer Metzger's testimony in the motion for mistrial.

### 6. Linda Barnard

During the defense case, defendant called Linda Barnard, a marriage and family therapist, to testify concerning intimate partner violence. She testified, based on defendant's uncorroborated recitation of events, that defendant had posttraumatic stress disorder and had been the victim of trauma.

On cross-examination, the prosecutor asked questions relating to the use of manipulative strategies in relationships and the January 21, 2008, visit by officers to the residence:

"Q    So if your person that you are in love with says they're going to kill themselves, a person goes to that person to stop that?

21

"A     Yes, they do.

"Q     Making false police reports regarding domestic violence.  You don't know whether the event involving the gun to [Craig's] head is true or not, do you?

"A     No, I don't.

"Q     You would agree, certainly, that the investigation was sloppy, to say the least, correct?

[Defense counsel]:   Object, outside her knowledge.

THE COURT:         Sustained.

"Q     . . .Well, you're very aware of the domestic violence laws, correct?

"A     Yes, I am.

"Q     You are aware if a gun is involved in any domestic violence dispute that officers are supposed to collect it, correct?

"A     Yes.

"Q     And it wasn't collected in this case, was it?

"A     No, it wasn't.

"Q     They didn't ask any question of the family involving [defendant] as to whether she was abused or not?

"A     They didn't ask her whether she was abused or not?

"Q     Yes.

"A     I don't believe they did, no.

"Q     So would you agree that appeared to be a sloppy investigation?

"A     It's not according to protocol, so if that[] means sloppy, then okay.  But it's not according to protocol."

On appeal, defendant cites parts of this testimony in her contention that the prosecutor elicited improper lay opinion about whether defendant was going to kill Craig. Again, the relevance to that topic is not apparent.  And defendant's opening brief offers no explanation in that regard.  Accordingly, we need not consider it further.

IV

*Admission of Improper Victim Impact Evidence*

Barr testified that she regretted not doing something to prevent defendant from killing Craig because, if she had, Craig's daughters would still have a father. Defendant contends this was improper victim impact testimony. As noted, defendant objected to the evidence on this basis. The trial court overruled the objection, saying that the evidence went to Barr's state of mind about testifying. Because defendant also moved for a new trial based on the admission of the evidence, the court also discussed prejudice to defendant: "I don't think it's as prejudicial as [defense counsel is] characterizing it. The jury has already heard that [Craig] had two children. Obviously, the children are now no longer with their father. That's not so shocking. That's a fact they already knew. She did not talk about how losing their father has had any impact on the children. She didn't talk about how the loss of a father has impacted the children. She made a reference that she bore some sense of responsibility . . . ." Based on this the court also denied the new trial motion.

On appeal, defendant's argument is as follows:

"Here, while it certainly was obvious to jurors that Craig's two daughters had lost their father, there was no reason to let anyone testify about how badly they felt about that circumstance. Again, Barr's comments fed the prosecution's emotionally charged theme, showing how even one of [defendant's] supposed friends could be upset about the harm [defendant] caused and by highlighting the fact that Barr supposedly could 'foresee' the shooting, even though she had never before believed [defendant] could kill anyone."

This contention is different from the grounds for the trial objection. Barr testified that she felt bad, not that Craig's daughters felt bad. But defendant did not object that Barr's testimony was improper victim impact testimony relating to Barr's feelings. The objection was that, in the words of defense counsel at trial, "[t]he impact on the children is absolutely outside the area of consideration for this jury."

This is an example of appellate counsel's penchant in the briefing for misconstruing the record to support her contentions.  That strategy will not bear fruit.  As defendant did not object to the evidence on the specific grounds now urged on appeal, consideration of that issue on appeal was forfeited.

In any event, the trial court was correct.  Barr's testimony with respect to Craig's daughters did not tell the jury anything that the jury did not already know.  Craig had two daughters, and now they have no father.

V

*Failure to Instruct on Defense Against Intruder*

Defendant contends the trial court erred by refusing to instruct the jury that she was entitled to a presumption under Penal Code section 198.5 that, in her use of force against an intruder into her residence, she held a reasonable fear of imminent peril.  We conclude the trial court did not err by refusing to give the instruction because Craig was a family member, and, by the express language of the statute, a defendant cannot use the Penal Code section 198.5 presumption when the intruder is a family member.

Penal Code section 198.5 states, in part:  "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, *not a member of the family* or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred."  (Italics added.)

The clear language of the statute supports the trial court's ruling.  Since Craig, as defendant's husband, was a member of her family, she was not entitled to the presumption provided by Penal Code section 198.5.

Defendant argues that "Craig should not have been considered to be a member of [defendant's] family for purposes of applying Penal Code section 198.5 [because] the

24

section 198.5 presumption was designed to protect the occupants inside a residence when an intruder forcibly enters." For this proposition, defendant cites cases involving unrelated intruders. (See *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1361; *People v. Owen* (1991) 226 Cal.App.3d 996, 1003.) These cases are readily distinguishable because they did not deal with instances involving a member of the defendant's family, as was Craig in this case.

Defendant cites cases to the effect that one can burglarize his or her own house if the person does not have the right to enter. (See, e.g., *People v. Davenport* (1990) 219 Cal.App.3d 885, 892.) Penal Code section 198.5, however, expressly excludes family members from the reach of the presumption. That sets it apart from burglary jurisprudence. The family relationship does not depend on a right to enter the residence.

Defendant also argues that, as a policy matter, a battered woman should be entitled to invoke Penal Code section 198.5. In light of the express language of the statute which has the effect of precluding a woman from taking advantage of the presumption when the intruder is her husband, that policy decision is the province of the Legislature. (*In re James M.* (1973) 9 Cal.3d 517, 522.)

Finally, defendant argues that she and Craig were legally separated, signaling their intention to terminate the marriage. However, Penal Code section 198.5 does not contain an exception to the family member limitation for an intention, yet unrealized, to terminate the family relationship.

There was no instructional error.

## VI

### *Alleged Prosecutorial Misconduct*

Defendant contends that the prosecutor engaged in pervasive misconduct that had the effect of violating her due process and fair trial rights. We conclude that the prosecutor did not commit prejudicial misconduct.

A.      *Legal Background*

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

We consider each of the instances of prosecutorial conduct that defendant now asserts constituted misconduct.

B.      *Analysis*

1.      Cross-examination of Defendant

Defendant testified in her own defense and was cross-examined by the prosecutor.

On appeal, defendant claims that the prosecutor "continually badgered [her] during her testimony . . . ." In support of this claim, she cites cross-examination in which the prosecutor asked questions that had already been answered. However, defense counsel objected in those instances, and the objection was sustained. This does not constitute misconduct. A prosecutor does not commit misconduct merely by asking a question to which an objection was sustained. (*People v. Chatman, supra,* 38 Cal.4th at p. 405.)

26

In other instances, defense counsel objected that the prosecutor was badgering the witness by repeatedly asking questions that had already been asked. For example, the prosecutor asked defendant if a situation made her mad. She responded that she felt hurt. The prosecutor continued to ask if she was mad, and she continued to answer that she was hurt. Defense counsel objected that the question was asked and answered, but the trial court overruled the objection. This is not badgering; it is proper cross-examination. (See *People v. Valencia* (2008) 43 Cal.4th 268, 283 [vigorous cross-examination not misconduct].)

Other examples defendant gives of "badgering" are similar in that they constituted proper cross-examination, not badgering. The trial court appropriately overruled objections that questions had been asked and answered when defendant was evasive and did not actually answer the question.

Defendant complains that the prosecutor asked her questions about her sexual relationship with Craig. At trial, defense counsel objected to that line of reasoning on relevance grounds, which the court overruled. On appeal, defendant does not explain why the relevant questions constituted prosecutorial misconduct. She also notes that, at one point in the questioning concerning the sexual relationship, defense counsel objected that a question mischaracterized the evidence. The trial court sustained the objection. When the trial court sustains an objection, it is presumed that any prejudice arising from the question is abated. (*People v. Dykes* (2009) 46 Cal.4th 731, 764.) Defendant gives us no reason to conclude otherwise.

During cross-examination of defendant, while the jury was excused, defense counsel argued that the prosecutor's badgering violated defendant's due process rights. She also argued that the prosecutor's technique of questioning defendant about extensive e-mails and texts between defendant and Craig should not be allowed. She said that "the technique is designed to badger and wear down [defendant], so it effectively denies her her right of Fifth Amendment right of testifying."

To the contrary, questioning on relevant topics is not misconduct. And defendant does not contend that the trial court erred by admitting the evidence.

### 2. Misstatement of Law

Defendant contends that the prosecutor committed misconduct during closing argument by twice misstating the law. To the contrary, the prosecutor did not misstate the law.

It is misconduct for a prosecutor to misstate the law in closing argument. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)

During his argument, the prosecutor said: "If you're going to shoot someone to kill them, you can't say, well, I'm mad at him, so, therefore, I'm acting in self-defense. You can be mad, but your sole reason for shooting the gun has to be because you believe at that exact moment you have to use self-defense. [¶] So you can't say, well, I want to kill him, I want to kill him, I want to kill him, and then make up this, I had to act in self-defense. Or even if you actually believed you have to act in self-defense, if the fact that you want to kill him is playing into your decision to use deadly force, the law says that's not a fair application of self-defense." Defense counsel objected that the argument "confuses the law." The court overruled the objection.

Later, the prosecutor argued that if a person shoots another out of both anger and fear, self-defense does not apply. Again, defense counsel objected, and the trial court overruled the objection.

Defendant claims that these arguments were misstatements of the law under *People v. Trevino* (1988) 200 Cal.App.3d 874 at pages 878 to 880 (*Trevino*). In *Trevino*, the court held that "an instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law. [Citations.] [¶] In so holding, we do not mean to imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense. . . . [¶] [I]t would be unreasonable to require an absence of any feeling other than fear, before the homicide

28

could be considered justifiable. Such a requirement is not a part of the law . . . . Instead, the law requires that the party killing *act* out of fear alone." (*Id.* at p. 879, original italics.)

The prosecutor's argument was a fair statement of the law under *Trevino*. The prosecutor did not say that anger was inconsistent with self-defense. Instead, he argued that fear had to be the sole cause of the killing. Since the argument was not a misstatement of the law, there was no prosecutorial misconduct.

Defendant also contends that the prosecutor committed misconduct by arguing that defendant could not have been acting out of heat of passion because her problems with Craig, in the words of the prosecutor, "go back years." Defendant did not object to this statement of the law; therefore, consideration of the issue on appeal is forfeited.

In any event, the argument was not a misstatement of the law. The Supreme Court has held that "provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time." (*People v. Wharton* (1991) 53 Cal.3d 522, 569.) But the prosecutor did not mislead the jury on the law; instead, the prosecutor's argument was that, on the facts of this case, the problems that defendant and Craig had been dealing with for years did not, as a factual matter, provoke defendant under these circumstances. Therefore, there was no prosecutorial misconduct.

3.      Questioning and Argument Concerning Failure to Seize Gun

At trial, defendant made a motion for mistrial based on alleged prosecutorial misconduct. The focus of the motion was the prosecutor's questioning of Officer Mori concerning why he did not seize the gun in defendant's bedroom during the January 21, 2008, investigation of the 911 call. Defense counsel complained that the questions made it sound like defendant had not been forthcoming about the presence of the gun in the house. Counsel also argued that it was improper for the prosecutor to ask questions that made it appear that having the gun in the house was illegal.

As to the latter argument, counsel said: "It was improper to ask questions of a witness [Officer Mori], especially a police officer, suggesting the conduct is improper when the prosecutor knows it's lawful conduct, to wit, you can't ask him, well, shouldn't you have just taken that gun to protect against discharge, as if to suggest [defendant] was going to be out there accidentally discharging, as she's public enemy number one as a result of that, when, in truth, the law permits you to have a loaded gun in your house. Whether it's subject to accidental discharge or not is the risk that homeowner takes when they decide to have the gun in their home."

The trial court discussed each of defendant's grounds for the motion, recalling the testimony given on each issue, and ultimately denied the motion for mistrial, finding there was no prosecutorial misconduct.

On appeal, defendant relies on this motion for mistrial based on prosecutorial misconduct to argue that an objection was made to the prosecutor's questioning of witnesses, including Officer Metzger and therapist Barnard about whether the officers had a duty under Penal Code former section 12028.5 to seize the gun. She claims that there was no such duty and, therefore, questioning the witnesses as if there were a duty was prosecutorial misconduct. She argues, "[g]iven that the officers were legally in the right, and the prosecutor's accusations were both factually and legally misplaced, the line of questioning and related argument insinuated that the prosecutor was privy to some facts or law not presented to the jury on the legality of letting [defendant] keep her gun."

Defendant's argument concerning alleged prosecutorial misconduct (that the officers had no duty to seize the gun under Pen. Code, former § 12028.5) was not raised in the trial court. As noted, the trial court properly considered the grounds asserted in the motion for new trial and ruled on those grounds. It was not given the opportunity to rule on the grounds now suggested by defendant. Since defendant's argument in the trial court did not include the grounds advanced on appeal, defendant forfeited consideration of the issue. (*People v. Price, supra,* 1 Cal.4th at p. 447.)

30

4.      Questioning of Defendant's Character Witness

The defense called defendant's aunt, Joan Murphy, to testify concerning defendant's good character.  On cross-examination, the prosecutor asked Murphy whether she was aware of many of the facts about the difficult relationship between Craig and defendant and about defendant's prior bad acts and, if not, whether knowing those facts changed her opinion of defendant.  Murphy answered that none of the stated facts changed her opinion of defendant.  During that examination, defendant made a motion for mistrial based on the prosecutor's questions on two subjects:  whether Murphy knew (1) defendant pointed a gun at Craig's head and (2) defendant lied under oath about when she bought ammunition for the gun.  She claimed there was no evidence to support the questions.  The trial court denied the motion for mistrial, concluding that the prosecutor did not engage in misconduct and the proceedings did not violate defendant's fair trial rights.

On appeal, defendant contends the prosecutor committed misconduct by asking Murphy whether defendant ever told her she had put a gun to someone's head or that she had lied under oath about when she bought bullets.  In support of her contention on appeal, defendant cites two federal circuit cases in which the prosecution asked the defense's character witness a question that assumed the truth of the crime for which the defendant was being prosecuted.  (*United States v. Shwayder* (9th Cir. 2002) 312 F.3d 1109, 1120 (*Shwayder*); *United States v. Oshatz* (2d Cir. 1990) 912 F.2d 534, 539 (*Oshatz*).)  Those cases held that it is improper "for the prosecution to ask questions on cross-examination [of a character witness] that assume the defendant's guilt of the precise acts for which he is on trial" because it "undermines the presumption of innocence and thus violates a defendant's right to due process."  (*Shwayder, supra,* at pp. 1120, 1121, fn. omitted; *Oshatz, supra,* 912 F.2d at pp. 537-540.)  Those cases are easily distinguished because, here, the prosecutor did not ask the character witness questions that assumed defendant's guilt of the charged crime.  (See *People v. Harris* (1989) 47

31

Cal.3d 1047, 1071 [decision does not stand for proposition not considered].)  Therefore, defendant offers no authority for the proposition that the questions the prosecutor asked the character witness violated defendant's due process rights.  (*Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [point forfeited if not supported by authority].)  We also note that we are not bound by decisions of the lower federal courts.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1292.)

In any event, even if we assume, without deciding, solely for the purpose of argument, that the prosecutor's questions concerning defendant holding the gun to Craig's head and defendant lying under oath about when she purchased bullets went beyond the evidence in this case, we agree with the trial court that the questions did not violate defendant's due process or fair trial rights.  There was evidence that Craig was heard during the 911 call on January 21, 2008, saying that defendant held a gun to his head, even if the officers who responded ultimately concluded that the statement was unfounded because there was dust on the gun.  So the jury already knew about that.  Also, the trial court instructed the jury that the attorney's questions were not evidence.  And the questions related to collateral matters, not to defendant's guilt.  Therefore, there was no violation of defendant's due process and fair trial rights.

VII

*Alleged Cumulative Error*

Finally, defendant contends that the combined effect of multiple trial court errors violated his due process rights even if those errors were not individually prejudicial.  Since we do not find that a combination of trial court errors occurred, we need not consider this cumulative error argument.

32

DISPOSITION

The judgment is affirmed.


                                               NICHOLSON        , Acting P. J.



We concur:



       ROBIE            , J.



       DUARTE          , J.